UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ABC BEVERAGE CORPORATION
& SUBSIDIARIES, f/k/a Beverage
America Inc. & Subsidiaries,
    Plaintiff,

             Case No.  1:07-cv-051

-v-

             HONORABLE PAUL L. MALONEY

UNITED STATES OF AMERICA,
    Defendant.

OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT (DKT. NO. 46)

OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT (DKT. NO. 47)

This Court has before it cross motions for summary judgment.  Defendant United States of America filed its motion (Dkt. No. 46) for summary judgment on April 8, 2008.  Later that same day, Plaintiff ABC Beverage filed its motion (Dkt. No. 47) for summary judgment.  This Court has read the motions, briefs, responses, replies and relevant authority.  This Court finds oral argument would not be helpful in resolving the contested issues.  *See* W.D. MICH. L.CIV.R. 7.2(d).

The central issues raised in the cross motions are whether Plaintiff, upon acquisition of property, can claim a business deduction for the portion of the total purchase price attributable to buying out an excessive lease and, if so, when Plaintiff is entitled to take the deduction.

I.  BACKGROUND

In 1987, Corporate Property Associates (Landlord) entered into a lease with Tandem Holdings, Inc. for property located at 555 McDonnell Boulevard (McDonnell Property) in Hazelwood, Missouri.  (Dkt. No. 46-6, Exhibit 4 to Defendant's motion - Lease).  The initial lease

period lasted 300 months and provided for five successive five-year renewal options.  (*Id.* ¶ 5).
Through a series of corporate and stock transactions, one of Plaintiff ABC Beverage's subsidiaries
acquired the lease in 1995.  (Dkt. No. 46-4, Exhibit 2 to Defendant's motion - Plaintiff's
supplemental answers to Defendants' first request for admissions ¶¶ 3 and 5).  The lease included
a provision for calculating the amount of rent owed each month.  (Dkt. No. 46-6 - Lease ¶ 6).  The
rent paragraph refers to a schedule attached to the lease as Exhibit C, where the formulas for rent
calculations were set forth.  (*Id.*).

　　　The lease contained a clause allowing the tenant the option to purchase the McDonnell Property.[1]
(Dkt. No. 46-6 - Lease ¶ 28).  The option could only be exercised between the tenth and eleventh
anniversary of the date of the lease.  (*Id.*).  On December 10, 1996, the then tenant notified Landlord it was
exercising its right to purchase the property under paragraph 28.  (Dkt. No. 46-7, Exhibit 5 to Defendant's
motion - Notice).  The lease provides a means for calculating the purchase price in the event the tenant
exercises its option to purchase the property.  Under paragraph 28, the purchase price was the greater of
(a) the fair market value of the leased premises or (b) the sum of the acquisition cost and any prepayment
penalty which may be payable under the note or mortgage covering the leased premises.  (Dkt. No. 46-6 -

---

[1]Plaintiff describes the option as "irrevocable," citing paragraph 28 of the lease.  (Dkt.
No. 48 - Plaintiff's brief in support at 2).  Paragraph 28 does not use the word "irrevocable."
(Dkt. No. 46-6 - Lease).  In contrast, paragraphs 13(b) and 14(i) both contain the phrase
"irrevocable offer."  Those two latter paragraphs allow the lessee to terminate the lease in the
event of condemnation, fire or other casualty, but require the lessee to purchase the property.
Like paragraphs 13(b) and 14(i), paragraph 19(b)(5) gives the landlord, under certain conditions,
the option to require the tenant to make an "irrevocable offer" to purchase the premises.  (*Id.*).
Although the lease does not specify whether the buyer's offer is irrevocable under paragraph 28,
generally, an option to purchase is an irrevocable offer by the *seller* and cannot be withdrawn
during the period specified by a lease.  49 Am. Jur. 2d *Landlord and Tenant* § 297 (2006); *Riddle
v. Elk Creek Salers, Ltd.*, 52 S.W.3d 644, 646 (Mo. Ct. App. 2001) ("[A]n option is merely a
continuing and irrevocable offer that a seller cannot withdraw during a stated period." (citing
*HGS Homes v. Kelly Residential Group*, 948 S.W.2d 251, 255 (Mo. Ct. App. 1997)).

2

Lease).  The lease included a definition of the phrase "fair market value."  "[F]or the purposes of this Paragraph 28, the term 'Fair Market Value' shall mean the fair market value of the Leased Premises as affected and encumbered by this Lease and assuming that the Term has been extended for all extension periods provided herein." (*Id.*).  Paragraph 27 of the lease outlined the procedure for determining the fair market value of the property.

Plaintiff sought several appraisals of the property.  A 1995 appraisal of the property by Nunnick and Associates valued the property at $2, 750,000. (Dkt. No. 48-12, Exhibit 11 to Plaintiff's brief in support - Nunnick Appraisal).  The Nunnick appraisal calculated the fee simple fair market value of the property using a cost approach, a sales comparison approach, and an income capitalization approach. (*Id.*).  In 1998, R.A. Buckles & Associates, using the same three approaches, also appraised the property at $2,750,000.  (Dkt. No. 48-13, Exhibit 12 to Plaintiff's brief in support - R.A. Buckles appraisal).  Also in 1998, Plaintiff's expert, Mr. Thomas McReynolds concluded the $2,750,000 Nunnick appraisal was still an accurate and fair valuation of the property.  (Dkt. No. 48-5, Exhibit 4 to Plaintiff's brief in support - McReynold's Appraisal).  Mr. McReynolds stated he was generally in agreement with the values reached in the Nunnick appraisal under all three approaches.  (*Id.* at 2).  Mr. McReynolds also performed an analysis of rental rates and concluded a fair and reasonable rental rate for the property at $356,500 per year. (*Id.* at 1).

The parties apparently could not agree on the purchase price, even with the provisions contained in the lease agreement for determining the purchase price of the property.  On April 24, 1997, Landlord sent a letter to Plaintiff which outlined the areas of disagreement. (Dkt. No. 46-8, Exhibit 6 to Defendant's motion - April 1997 Letter).  Landlord and Plaintiff disagreed on the amount of Basic Rent payable on April 1, 1997, with Plaintiff concluding the annual rent should be $921,131.52 and the landlord concluding

the annual rent should be $1,132,310.44.[2]  (*Id.*).  Landlord also disagreed with Plaintiff's appraisals of the fair market value of the property, as that phrase was defined in the lease.  (*Id.*).  Specifically, Landlord argued the appraisals failed to include any valuation of the lease, assuming the lease had been extended for the entire extension period.  (*Id.*).  Based on the differences, Landlord offered to sell the property for $14,768,000, with conditions.  (*Id.*).

    The parties remained at an impasse and on October 2, 1997, Landlord notified Plaintiff that it considered Plaintiff in default under the lease for failure to pay the full amount of rent owed.  (Dkt. No. 46-9, Exhibit 7 to Defendant's motion - October 1997 Letter).  Landlord exercised its remedies under

---

[2]Under paragraph 1(e) of Lease Exhibit C, beginning on April 1, 1997

each monthly installment of Basic Rent shall be equal to the total amount of the monthly installment of Basic Rent due March 1, 1997 multiplied by the CPI factor for the applicable Basic Rent Payment Date if it is a Quinquennial Anniversary or, if it is not, for the immediately preceding Quinquennial Anniversary.

Exhibit C to the Lease then provides the meaning of "CPI Factor."

    2.  Definitions
        b.  The "CPI Factor" for any Quinquennial Anniversary shall mean the lower of (1) one plus the product of one-tenth (.1) and the number of years between March 1, 1987 and the applicable Quinquennial Anniversay (i.e., for the first Quinquennial Anniversary, this number shall be 1.5; for the second Quinquennial Anniversary, it will be 2.0; etc.) and (2) the highest of:
            (i) one;
            (ii) the CPI Factor for the immediately preceding Quinquennial Anniversary; or
            (iii) one plus a fraction, the numerator of which shall be the Most Recent CPI minus the Beginning CPI and the denominator of which shall be the Beginning CPI.
Nothwithstanding anything to the contrary contained herein, in no event shall the per annum increase in the CPI exceed ten percent (10%).

(*Id.* Exhibit C to Lease).

paragraph 19(b)(v) of the lease and requested Plaintiff make an offer to purchase the property.[3]  (*Id.*).
Landlord further identified Mr. Edward Klein of the Binswanger Company as its appraiser.  (*Id.*).  Mr.
Klein appraised the market value of the lease fee interest of the property at $14.1 million.  (Dkt. No. 48-10,
Exhibit 9 to Plaintiff's brief in support - Binswanger appraisal).

On October 3, 1997, the landlord filed suit in Missouri state court over the amount of rent due
under the lease.  While the action was pending, the parties entered into an agreement in January 1999 in
which they agreed the fair market value of the property, as defined in the lease, would be no less than
$9,000,000.00 and no greater than $11,500,000.00.[4]  (Dkt. No. 46-12, Exhibit 10 to Defendant's motion -
January 1999 letter).  The parties further agreed to calculate the existing rent at $76,760.96 per month and
that Plaintiff would immediately bring current its unpaid rent using that figure.  (*Id.*).

The parties reached an agreement on the final price in October 1999.  (Dkt. No. 46-14, Exhibit 12
to Defendant's motion - Agreement Letter).  Parties agreed Plaintiff would pay $11,000,000.00 for the
McDonnell Property.  (*Id.*).  The sale of the property was finalized on November 1, 1999.  (Dkt. No. 46-15,
Exhibit 13 to Defendant's motion - Closing Statement).

On its 1997 tax return, Plaintiff claimed a deduction for $6,250,000.00 as a lease termination
expense and capitalized the McDonnell Property for $2,750,000.00.[5]  (Dkt. No. 46-5, Exhibit 3 to

---

[3]The letter describes the offer to be made by the tenant as a "rejectable offer."  (Dkt. No.
46-9 - October 1997 letter).  As explained in footnote 1, the offer the tenant was required to
make under this portion of the lease was irrevocable.  The lease is silent as to whether the seller
was obligated to accept an offer required by this portion of the lease.  The lease outlined how the
offer was to be calculated.

[4]The state suit was ultimately resolved in favor of the landlord.  (Dkt. No. 46-13, Exhibit
11 to Defendant's motion - Order).

[5]Plaintiff apparently based the deduction on its calculation that the minimum it would
have to pay to acquire the property was $9 million.  Using the minimum purchase price and
subtracting the appraisals for the property, Plaintiff concluded the cost of buying out the lease
was $6.25 million.

Defendant's motion - Protest Letter).  On November 17, 2005, the Internal Revenue Service assessed an income tax deficiency of $2,460,591.00 against Plaintiff.  (*Id.*).  Plaintiff subsequently filed a complaint seeking a refund for the assessment.

Plaintiff retained Mr. McReynolds as an expert witness in this action.  Mr. McReynolds testified at his deposition that he had never before seen a rent escalation clause like the one contained in the subject lease.  (Dkt. No. 48-4, Exhibit 3 to Plaintiff's brief in support - McReynolds' deposition at 35).  He explained the way rent was calculated in the lease under Exhibit C, paragraph 2(b)(iii), rent amounts grow exponentially similar to the way interest compounds.  (*Id.* at 37-42).  Mr. McReynolds opined, under a strict interpretation of the lease, an annual rent of $1,100,000 beginning in April 1997 would increase "to nearly $645 million for the property in the final five years of the lease."[6]  (*Id.* at 78).

## II.  LEGAL FRAMEWORK

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions together with the affidavits show there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c).  The burden is on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by pointing out the absence of evidence to support the nonmoving party's case.  *Bennett v City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  The facts, and the inferences drawn from them, must be viewed in a light most favorable to the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (quoting *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  Once the moving party has carried its burden, the nonmoving party

---

[6]From the excerpts of the deposition provided, it appears Mr. McReynolds is reading from a letter he wrote dated November 1.  Plaintiff's brief cites Mr. McReynolds' deposition for this point, but has not directed this Court to the letter which is being discussed. (Dkt. No. 48, Plaintiff's brief in support at 3).

must set forth specific facts showing there is a genuine issue for trial.  FED. R. CIV. P. 56(e); *Matsushita*, 475 U.S. at 574.  The question is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252.

III.  ANALYSIS

The parties generally agree that the legal aspect of the dispute turns on the appropriate interpretation of three authorities: 26 U.S.C. § 167(c)(2) (section 167), *Millinery Ctr. Bldg. Corp. v. IRS*, 350 U.S. 456 (1956) (*Millinery Center*), and *Cleveland Allerton Hotel, Inc. v. IRS*, 166 F.2d 805 (6th Cir. 1948) (*Cleveland Allerton*).  The issues presented by the parties are (1) whether Plaintiff, upon acquisition of property, can claim a business deduction for the portion of the total purchase price attributable to buying out an excessive lease and, (2) if so, when may Plaintiff take the deduction.

A.  Defendant's Motion for Summary Judgment (Dkt. No. 46)

Defendant argues section 167(c)(2) prohibits any allocation of the purchase price of the property to the leasehold interest and concludes Plaintiff cannot claim any of the cost of terminating the leasehold as a business expense.  As an alternative, Defendant asserts *Millinery Center* undermined the Sixth Circuit Court of Appeal's holding in *Cleveland Allerton*, where the circuit court allowed a similar deduction. Finally, Defendant contends that even if Plaintiff is able to claim a deduction, the deduction should have been claimed in 1999, rather than in 1997.

Whether section 167(c)(2) governs the issue is a question of statutory construction and interpretation.  "The starting point in any case involving the meaning of a statute [] is the language of the statute itself." *United States v. Plavcak*, 411 F.3d 655, 660 (6th Cir. 2005) (alteration in original) (quoting *Group Live & Health Ins. Co. v. Regal Drug Co.*, 440 U.S. 205, 210 (1979))  One of the most basic tenets of statutory construction requires a court to afford the statute its plain meaning when the language in the

provision is unambiguous, providing there is no clear legislative intent to the contrary. *Burlington N. R.R. Co. v. Oklahoma Tax Comm'n*, 481 U.S. 454, 461 (1987) (quoting *United States v. James*, 478 U.S. 597, 606, 106 S.Ct. 3116 (1986)). "Unless exceptional circumstances dictate otherwise, '[w]hen we find the terms of a statute unambiguous, judicial inquiry is complete.'" *Id.* (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)). *See Plavcak*, 411 F.3d at 661. Section 167(c) provides

> (c) Basis for depreciation. –
>> (1) In general. – The basis on which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 1011, for the purpose of determining the gain on the sale or other disposition of such property.
>> (2) Special rule for property subject to lease. – If any property is acquired subject to a lease
>>> (A) no portion of the adjusted basis shall be allocated to the leasehold interest, and
>>> (B) the entire adjusted basis shall be taken into account in determining the depreciation deduction (if any) with respect to the property subject to the lease.

The first step requires a determination whether the statute is ambiguous. This Court concludes the statute is not ambiguous. The statute plainly and unambiguously outlines what happens, for the purposes of depreciation, when property is acquired subject to a lease. The statute makes no attempt to define or explain the phrase "subject to a lease." The United States Supreme Court has held, as a general rule, that a common law term in a statute comes with its common law meaning, absent anything to the contrary. *Safeco Ins. Co. of America v. Burr*, ___ U.S. ___; 127 S.Ct. 2201, 2209 (2007) (citing *Beck v. Prupis*, 529 US. 494, 500-501 (2000)). *See also Morrisette v. United States*, 342 U.S. 246, 263 (1952) (holding, when Congress uses language with a settled meaning in common law, Congress is presumed to know that meaning and to accept that meaning). It is axiomatic that when an individual holds, at the same time, a greater and a lesser estate in land, the larger estate subsumes a smaller estate.[7] *See* 28 Am. Jur. 2d

---

[7] The Lease specifies it "shall be governed by and construed according to the laws of the State of Missouri." (Dkt. No. 46-6 - Lease ¶ 33). Under Missouri property law, upon the

Estates §§ 423 and 430 (2000)[8]; 49 Am. Jur. 2d *Landlord and Tenant* § 195 (2006).  *See also Millinery Ctr. Bldg. Corp. v. IRS*, 221 F.2d 322, 324 (2d. Cir. 1955) ("Because petitioner also happened to be the tenant under the lease, its purchase resulted in the merger of the leasehold in the fee and gave it a good bargain.").  The property here was subject to a lease <u>before</u> Plaintiff acquired it with Plaintiff as lessee.  Therefore, when Plaintiff acquired the property, the leasehold merged with the larger estate and the property was no longer subject to a lease.  The contract includes evidence that the parties intended title to merge upon the purchase of the property by the lessee.  Paragraph 25 of the Lease provides there shall be no merger of title

> unless and until all Persons having any interest in (i) this Lease as Tenant or the leasehold estate created by this Lease and (ii) this Lease as Landlord or the fee estate in or ownership of the Leased Premises or any part thereof sought to be merged shall join in a written instrument effecting such merger and shall duly record the same.

(Dkt. 46-6 - Lease).  The conditions under which the Lease allowed the merger of title were met when Plaintiff purchased the property.  Paragraph 16(b) also provides, upon completion of purchase  of the property by the tenant, the tenant may elect to terminate the lease.  (*Id.*).

Whether property is acquired by the lessee of that property or by a third party does make a

---

purchase or acquisition of the property by Plaintiff, the lessee, the leasehold is extinguished and Plaintiff possessed the property in fee simple, unencumbered by any lease.  *See Newfeld v. Chem. Dynamics, Inc.*, 784 S.W.2d 240, 242 (Mo. Ct. App. 1989) ("Where the greater and lesser estate meet in the same person and in the same right, the lesser estate is immediately annihilated." (citing *Reed v. Inness*, 102 S.W.2d 711, 716 (Mo. Ct. App. 1937)).  The Supreme Court summarized a "general and longstanding rule in federal tax cases that although state law creates legal interests and rights in property, federal law determines whether and to what extent those interests will be taxed."  *United States v. Irvine*, 511 U.S. 224, 238 (1994).  *See also Drye v. United States*, 528 U.S. 49, 58 (1999) ("we look initially to state law to determine what rights the taxpayer has in the property that the government seeks to reach, then to federal law to determine whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of federal tax lien legislation.").

[8]The authors of the second edition of American Jurisprudence also state the merger doctrine is now practically extinct (49 Am. Jur. 2d *Landlord and Tenant* § 425 (2006)) and whether estates merge is now generally decided by the intent of the parties (*Id.* §§ 426 and 427).

significant difference in terms of both the rights acquired and the tax consequences of the acquisition. Defendant argues, under section 167 (c)(2), it should not make any difference who acquires the property. What property one acquires and the tax consequences of that acquisition manifest at the instant of acquisition.  If leased property is sold by the owner to a third party, the third party acquires a reversion, but no concurrent right to possession.  The tax consequences of the third party's acquisition are outlined under section 167 (c)(2).  However, when the lessee of the property acquires the property, the lease and the reversion merge and there is no lease burdening the estate.  Consequently, section 167 (c)(2) would not apply because the property is not subject to a lease.

The legislative history of this section is not to the contrary.  Like the statute, both parties argue the legislative history clearly and unambiguously supports their position.  Section 167 was enacted as part of the Omnibus Budget Reconciliation Act of 1993, P.L. 103-66, 107 Stat. 532.  Both parties agree that a portion of the Act addressed the treatment of intangibles, for tax purposes,  under Section 197.  (Dkt. No. 46 at 9; Dkt. No. 48 at 26).  Section 167(c)(2) excludes leasehold interests from the effect of Section 197. The Conference Report includes the following discussion of leasehold interests:

> Interests under leases of intangible property. - The term "section 197 intangible" does not include any interest as a lessor or lessee under an existing lease of tangible property (whether real or personal).  The cost of acquiring an interest as a lessor under a lease of tangible property where the interest as lessor is acquired in connection with the acquisition of the tangible property is to be taken into account as part of the cost of the tangible property.  For example, if a taxpayer acquires a shopping center that is leased to tenants operating retail stores, the portion (if any) of the purchase price of the shopping center that is attributable to the favorable attributes of the leases is to be taken into account as a part of the basis of the shopping center and is to be taken into account in determining the depreciation deduction allowed with respect to the shopping center.

(Dkt. No. 48-18, Exhibit 15 to Plaintiff's brief in support - H.R. Conf. Rep. 103-213 at 681-682 (footnotes omitted)).  The first sentence of this passage, in its most obvious and plain meaning, applies to situations where parties are acquiring an interest in property *as a lessor or a lessee.*  If a party does not acquire the property as a lessor or a lessee, the section being discussed would not apply.  As Plaintiff did not acquire

the McDonnell Property as a lessor, obviously Plaintiff would not pay itself rent, Section 167(c)(2) should not apply.  Because this Court concludes Section 167(c)(2) does not apply here, the next step is to determine the applicable precedent.[9]

This Court is obligated to follow the Sixth Circuit's opinion in *Cleveland Allerton*.  Under *Cleveland Allerton*, Plaintiff is entitled to claim, as a business expense, the cost associated with buying out an onerous lease.  A review of *Cleveland Allerton* and *Millinery Center* is helpful here.  In *Cleveland Allerton*, the plaintiff-petitioner owned and operated a hotel on a leased premises.  166 F.2d at 805.  The petitioner had a lease with roughly 80 years left on the term.  *Id.*  The petitioner paid $25,000 per year in rent, but determined the rent was excessive by $15,000 per year.  *Id.*  The opinion states that the petitioner "was the owner of a 16-story brick and steel hotel" who realized "ultimately it might lose its building, if it found no escape from the obligation."  *Id.*  After negotiations, the petitioner purchased the property for $441,250.  *Id.* at 806.  The Sixth Circuit found support for the petitioner's claim that the "value of the land was no more than $200,000," not counting the value of the lease.  *Id.*  The petitioner claimed a deduction, a business expense based on the difference between the purchase price and the fair market value of the real estate.  *Id.*  The petitioner claimed a deduction for the cost of buying out a burdensome lease, even though there was no specific designation of the amount paid for the purchase of the leasehold or for the reversionary interest in the land.  *Id.*  The Tax Court rejected the petitioner's arguments.  *Id.* at 805.

---

[9]Defendant directs this Court to several other sections of the tax code in footnote 3 to its brief.  *See* Dkt. No. 46 fn. 3.  None of the sections are dispositive.  26 U.S.C. § 263(a)(1) prohibits deductions for any amount paid for new buildings or permanent improvements made to increase the value of any property or estate.  Plaintiff is not attempting to claim any deduction for the amount paid for a new building.  Plaintiff is attempting to deduct the amount paid to buy out an allegedly onerous lease.  26 U.S.C. § 162(a)(3) authorizes a business deduction for rental expenses for "property to which the taxpayer has not taken or is not taking title or in which he has no equity."  Because Plaintiff acquired title to the property, it cannot take a deduction under Section 162.  Finally, 26 U.S.C. § 1012 provides "the basis of property shall be the cost of such property."  Again, Plaintiff alleges the amount it paid reflects more than the cost or value of the property, and urges the Court to look through form to the substance of the transaction.

11

The Sixth Circuit agreed with the petitioner, and reversed and remanded the action to the Tax Court. *Id.* at 807. The circuit court began its analysis by pointing out the difference between the petitioner who was buying out its own lease (as here) and a third-party investor who buys real estate subject to a long-term profitable lease. *Id.* at 806. The circuit court concluded the acquisition of the reversionary interest as a capital asset worth $441,250, "requires, it seems to us, naivete not attributable to experienced and sophisticated taxing authority." *Id.* at 807. The circuit court concluded the taxing authority should "look through form to substance" and allow the petitioner to claim a business deduction for escaping a burdensome lease in the amount it paid over $200,000. *Id.* The Sixth Circuit also concluded the deduction must be taken during the year when made. *Id.*

In *Millinery Center*, the petitioner leased land and, under the terms of the lease, erected a 22-story building. *Millinery Ctr. Bldg. Corp. v. IRS*, 21 T.C. 817 (1954). In April 1945, the petitioner exercised its option to extend the lease for another twenty-one years, through April 30, 1966. *Id.*

Title to the building was in petitioner, but at the eventual termination of the lease it would vest, without payment, in the lessor, at the lessor's option. Accordingly, the case at bar is distinguishable on this point which formed in part the basis of the ultimate Supreme Court decision.

Also under the lease, rent under the renewal period was six percent of the value of the land, but not less than $118,840. *Id.* The value of the land in 1945, if vacant and unimproved, was $660,000. *Id.* at 821. Because the value of the land was low, the petitioner would have to pay $118,840 in annual rent. *Id.* at 819. In May 1945, the petitioner entered into an agreement to purchase the property for $2,100,000. *Id.* The petitioner sought to deduct $1,500,000 as a business expense, the difference between the value of the unimproved land and the price paid, asserting the rent it was paying was excessive. *Id.* at 821-822. The petitioner reasoned it was entitled to the deduction as the cost of cancelling a burdensome lease. *Id.* The Tax Court concluded the petitioner was not entitled to that deduction because it did not purchase an

12

unimproved plot, rather it purchased land with a $3,000,000 hotel on it that was also leased for another twenty-one years with an annual rent of $118,840. *Id.* at 822-823. The Tax Court explicitly disagreed with the outcome in *Cleveland Allerton*. *Id.* at 823.

On appeal, the Second Circuit agreed with the Tax Court that the money paid by the petitioner constituted the purchase of a capital asset rather than an ordinary business expense. *Millinery Ctr. Bldg. Corp. v. IRS*, 221 F.2d 322, 323 (2d Cir. 1955). The circuit court reasoned the result would be the same regardless of whether the lease was burdensome or not.[10] *Id.* at 324. The circuit court then noted the Tax Court made no finding that the lease was burdensome, "and the evidence in this respect is doubtful at best." *Id.* The circuit court disagreed with the Tax Court on one issue. The circuit court concluded, because a third-party purchaser of the property would be able to allocate a portion of the cost to the building and depreciate it, the petitioner should be able to do the same. *Id.* The circuit court then remanded the action to the Tax Court for a determination of how much of the $2,100,000 of the purchase price should be allocated to the land and separately to the building. *Id.* The petitioner appealed the decision to the United States Supreme Court.

The Supreme Court granted certiorari to the Second Circuit case because of the "apparent conflict" between the Second Circuit's decision in *Millinery Center* and the Sixth Circuit's decision in *Cleveland Allerton. Millinery Center*, 350 U.S. at 458-459. The Supreme Court affirmed the judgment of the Second Circuit. The Supreme Court explained the petitioner's evidence as to the fair market value of the unimproved land was irrelevant because the petitioner did not own the building and it leased land that was improved by a building. *Id.* at 459.

Petitioner tendered no evidence that it was paying excessive rent for what it was actually

---

[10]This conclusion distinguishes the Second Circuit's holding from the Sixth Circuit's holding. Under *Cleveland Allerton*, if the lease is burdensome, a taxpayer can deduct the portion of the total cost of purchasing property associated with buying out the lease.

leasing.  A complementary feature of the purchase of the lessor's interests in the land and building was the elimination of the obligation to pay rent on the improved land.  The purchase price presumably reflected this situation.  Whatever possible merit petitioner's contention might have were there proof of excessive purchase price can await such a case.  The purchase price paid by petitioner represents the cost of acquiring the complete fee to the land and the building, and no deduction as an ordinary and necessary business expense can be taken.

*Id.* at 460.

As is plain from the Supreme Court's decision, the outcome in *Millinery Center* hinged on factual issues including the lack of evidence that the rent paid under the lease was onerous.  The Supreme Court concluded, without that evidence, the price paid by the lessee presumably reflected the fair market value of the property it acquired.  The Supreme Court did not rule on whether a taxpayer could deduct the cost of buying out a burdensome lease because, in the facts before it, there was no burdensome lease.  Accordingly, the Supreme Court did not explicitly or implicitly overrule *Cleveland Allerton* and the circuit split has not been resolved.  The decision in *Millinery Center* left open the possibility that a party could establish that the price it paid to acquire property it was leasing reflected the value to the landlord of a lease that was onerous to the purchaser-tenant.  In such an event, the purchaser might be able to claim a business deduction for the cost of buying out the onerous lease, but not for the fair market value of the property.

With these conclusions of law, the interpretation of Section 167(c)(2) and the precedential value of *Cleveland Allerton*, a discussion of *Union Carbide Foreign Sales Corp. v. IRS*, 115 T.C. 423 (2000) is warranted.  *Union Carbide* presents a situation similar to that in *Cleveland Allerton*, *Millinery Center* and here.  The petitioner had a seagoing vessel manufactured for the purpose of transporting liquid chemicals.  *Id.* at 425.  Rather than paying for the vessel and having an asset on its balance sheet, the petitioner arranged to lease the vessel.  *Id.*  Under the agreement, the petitioner could pay a certain amount to walk away from the lease, or acquire the vessel.  *Id.*  In 1994, the petitioner opted to acquire the vessel and paid

14

$107,748,925, about twenty percent more than it would have had to pay to opt out of the lease. *Id.* at 426. The petitioner sought to allocate eighty-seven percent of the purchase price, or $93,883,295, to the termination of a burdensome lease. *Id.* For the purposes of the motion before the Tax Court, the Commissioner accepted the fact that the lease was burdensome and that the remaining portion of the purchase price reflected the value of the vessel, without considering the value of the lease. *Id.* Examining Section 167(c)(2), *Cleveland Allerton*, and *Millinery Center*, the Tax Court concluded the petitioner was not entitled to claim any portion of the purchase price of the vessel as a business expense. *Id.* at 438.

As described by the Tax Court, the issue presented was whether the phrase "acquired subject to a lease" requires the lease to continue after acquisition. *Id.* at 428. The Tax Court first addressed section 167(c)(2). The Tax Court concluded the grammatical syntax of the phrase did not clearly support either party's interpretation. *Id.* at 429 ("Congress' intent should not be decided solely by reference to finite nuances to be found in the rules of grammar. That is especially so here, where neither party's grammar argument is obviously more correct than the other's."). The Tax Court also concluded the legislative history did not provide a clear answer to the question. *Id.* at 431. The Tax Court resolved the issue, not by determining whether the statute required the lease to continue after acquisition, but by looking to whether the property was subject to a lease *prior to acquisition*.

> If property was not subject to a lease when it was acquired, section 167(c)(2) would not apply. So we must decide whether the property here was subject to a lease when it was acquired. The plain language of the statute is not limited in its application to acquisitions by lessors. Nor does it delineate a requirement that the lease continue after the acquisition, only that the property be acquired subject to a lease.
>
> In order to interpret the phrase "subject to a lease" solely as a continuing requirement as suggested by petitioner, we would have to look outside the statutory language. It appears that section 167(c)(2) would be triggered irrespective of whether the lease had a remaining term of 1 day or 10 years. With that premise, it is difficult to accept the petitioner's argument that its own circumstances should be exempted from the statutory requirements. If we accept petitioner's interpretation that the lease must continue, a taxpayer would be able to avoid the intended effect of section 167(c)(2) merely by simultaneous acquisition of tangible property, cancellation of the "existing lease", and the renegotiation of a new lease. Under petitioner's interpretation, section 167(c)(2) would be

rendered impotent and meaningless.  Whether we accept the fact that the petitioner's lease terminated upon, six months after, or sometime more distant from the acquisition of the vessel, the lease did not terminate until petitioner acquired the vessel.  Accordingly, petitioner acquired the vessel at a time when it was subject to a lease.

*Id.* at 432.

Respectfully, this Court disagrees with the Tax Court's reasoning and conclusions.  The tax consequences of purchasing the property for the buyer do not manifest themselves until the moment of acquisition.  In most instances the property's status prior to sale and the property's status after the sale will be identical, but not always.  Looking at a property's history reveals the error of the Tax Court's reasoning.[11]  Whether the property was subject to a lease 100 years, 50 years, 10 years or even 1 year prior to the sale is irrelevant to section 167(c)(2).  Whether a property was subject to a lease 1 day, 1 hour or even 1 minute prior to the sale is irrelevant to section 167(c)(2).  In order for section 167(c)(2) to apply, the lease must exist at the instant of acquisition, not moments before acquisition.  As explained above, when an individual holds, at the same time, a greater and a lesser estate in property, the lesser estate merges into the greater estate.  The act of acquiring the reversion simultaneously extinguished the leasehold and the petitioner acquired a fee simple estate, not a leasehold and a reversion.  The Tax Court's conclusion that the petitioner acquired the vessel subject to a lease cannot be reconciled with the Tax Court's concession that "the lease did not terminate until petitioner acquired the vessel."  The two acts, acquisition and termination, occur simultaneously, not sequentially.

The issue, as initially stated by the Tax Court, is whether the statute applies if the lease does not

_____

[11]There is further authority undermining the Tax Court's decision to look to the status of the lease prior to the sale of the property.  In the unique situation where a lessee exercises an option to purchase the property contained in a lease, the lease extinguishes when the option is exercised.  49 Am. Jur. 2d *Landlord and Tenant* §§ 318 and 319 (2006); *Cf. Henze v. Shell Oil Co.*, 258 S.W.2d 93 (Mo. Ct. App. 1988) (finding, based on the particular facts presented, the defendant who exercised an option to purchase under a lease was entitled to possession as a buyer or vendee in possession even though some aspects of the landlord-tenant relationship continued).

continue after acquisition.  The decision in *Union Carbide* artfully avoids resolving that issue.  It is unclear what the Tax Court means when it concludes it would have to look outside the statutory language in order to interpret the phrase "subject to a lease" as requiring the lease to be in place after the acquisition.  As explained above, when Congress uses a language that has a common law meaning, courts should presume, absent evidence to the contrary, that Congress intended the language to incorporate the common law understanding of that language.

The Tax Court then correctly states that section 167(c)(2) applies, regardless of the length of the lease when the lease continues after the transfer of property.  The Tax Court's next sentence squarely avoids resolving the issue as presented.  With the premise that section 167(c)(2) applies regardless of the length of the remaining lease, the Tax Court finds it "difficult to accept the petitioner's interpretation that the lease must continue."  This conclusion cannot be reconciled with the Tax Court's earlier findings that the grammatical syntax and legislative history would support the petitioner's interpretation, as well as the opposite interpretation.  The Tax Court hypothesizes a scenario where a third-party might simultaneously acquire property, cancel an existing lease and initiate a new lease.  There is nothing in the statute or legislative history suggesting this possibility was a concern.  Indeed, this Court has the utmost confidence in the taxing authority's ability to "look through form to the substance" of such a transaction.  The Tax Court's interpretation of the statute, that it applies if the property is subject to a lease prior to acquisition, would be subject to similar abuse.  The property owner could cancel the lease moments before it sells the property to a third party.  Upon the sale, the new owner would then lease the property to the same lessee.

The Tax Court then hypothesizes the outcome assuming section 167(c)(2) had not been enacted.  The Tax Court concedes petitioner's argument was successful in the Sixth Circuit in *Cleveland Allerton*.  *Union Carbide*, 115 T.C. at 434-435.  Discussing *Cleveland Allerton* and *Millinery Center*, the Tax Court wrote "it would appear that the approach of the Court of Appeals for the Sixth Circuit was rejected.

17

Accordingly, the vitality of the holding in Cleveland Allerton Hotel, Inc. v. Commissioner, supra, holding

is questionable." *Id.* at 437-438.  As outlined above, *Millinery Center* did not overrule *Cleveland Allerton*

and the Supreme Court left open the possibility that a party could establish circumstances under which it

would be entitled to claim a business deduction for buying out an onerous lease.  Of course, the Tax

Court's opinion is persuasive only, not binding on this Court.

Because Defendant is not entitled to summary judgment based on the interpretation of legal

authority, this Court must consider Defendant's alternative argument, that Plaintiff cannot take the

deduction until 1999, rather than in 1997.  Defendant argues section 26 U.S.C. § 461(h)[12] was not satisfied

until the seller transferred title to the property in 1999, and therefore the deduction was not proper until

1999.  A taxpayer using an accrual method of accounting is allowed to take a deduction for an expense

in the year in which the expense was incurred (26 U.S.C. § 162(a)), regardless of the year in which the

---

[12]26 U.S.C. § 461(h) provides

(h) Certain liabilities not incurred before economic performance. - -
> (1) In general. - - For purposes of this title, in determining whether an amount has been incurred with respect to any item during any taxable year, the all events test shall not be treated as met any earlier than when economic performance with respect to such item occurs.
> (2) Time when economic performance occurs. - - Except as provided in regulations prescribed by the Secretary, the time when economic performance occurs shall be determined under the following principles:
>> (A) Services and property provided to the taxpayer. - - If the liability of the taxpayer arises out of - -
>>> (i) the providing of services to the taxpayer by another person, economic performance occurs as such person provides such services,
>>> (ii) the providing of property to the taxpayer by another person, economic performance occurs as the person provides such property, or
>>> (iii) the use of property by the taxpayer, economic performance occurs as the taxpayer uses such property.

***

> (4) All events test. - - For purposes of this subsection, the all events test is met with respect to any item if all events have occurred which determine the fact of liability and the amount of such liability can be determined with reasonable accuracy.

18

expense was actually paid.  *United States v. Hughes Props., Inc.*, 476 U.S. 593, 599 (1986).  Defendant argues, under the accrual method of accounting[13], a taxpayer may not take a deduction until the satisfaction of (a) the "all events test" which determines the fact of liability and when the amount of liability can be determined with reasonable accuracy (26 U.S.C. § 461(h)(4); *United States v. Gen. Dynamics Corp.*, 481 U.S. 239, 242 (1987)) and (b) the "economic performance test" which provides that the "all events test" is not met any earlier than when economic performance has occurred with respect to the item that gave rise to liability (26 U.S.C. § 461(h)(1 and 2)).  Treas. Reg. § 1.461-1(a)(2); *Cleveland Trencher Co. v. IRS*, 166 F.3d 1213, 1998 WL 739894 (6th Cir. Oct. 8, 1998) (unpublished table opinion).  *See Metro Leasing and Dev. Corp. v. IRS*, 376 F.3d 1015, 1023 (9th Cir. 2004); *Intrex, Inc. v. IRS*, 321 F.3d 55, 48 (1st Cir. 2003).        The parties disagree on when the fact of liability was established.  Defendant alleges the fact of liability was not established until the parties reached an agreement in 1999.  Plaintiff asserts liability was established six months after it notified Landlord in December 1996 it was exercising its right to purchase the property.  Defendant argues Landlord's October 1997 letter alleging Plaintiff was in default on the lease establishes that the landlord did not consider Plaintiff's December 1996 letter to be an enforceable contract.  In response, Plaintiff contends Defendant's position is contrary to the holding in *Hughes Properties.*

*Hughes Properties* involved a casino attempting to claim a deduction based on the amount of money in progressive jackpots in slot machines.  476 U.S. at 595.  The casino operated progressive slot machines which paid fixed amounts for certain combinations of symbols.  *Id.*  The machines also had a progressive or accumulating jackpot for hitting one specific combination of symbols.  *Id.*  The casino set the initial minimum jackpot payoff, which would then progressively increase or accumulate based on the

---

[13]Defendant asserts Plaintiff uses the accrual method of accounting.  (Dkt. No. 46 at 18). *See* Treas. Reg. § 1.446-1 (outlining acceptable methods of accounting).  Plaintiff has not denied that assertion.

amount of money gambled in the slot machine. *Id.* The odds of winning the jackpot depends on the number of reels, the number of positions or symbols on each reel, and the number of winning symbols. *Id.* At the end of each fiscal year, the casino identified the total amount listed on the progressive jackpots as an accrued liability, and then subtracted the corresponding figure for the previous year to produce the current tax year's increase in accrued liability. *Id.* at 597. The casino then sought to deduct each year's accrued liability as a business expense under 26 U.S.C. § 162(a). *Id.* The Commissioner of Internal Revenue rejected the deduction. *Id.* The Supreme Court held the fact of liability was fixed and not contingent because, among other reasons, although the odds of anyone winning the jackpot were remote, as a matter of state law the amount of the jackpot could not be reduced without paying off the progressive jackpot and therefore the casino could not escape its liability. *Id.* at 601-602.

Viewing the evidence in a light most favorable to Plaintiff, there is a genuine issue of material fact when the fact of liability became fixed. Plaintiff exercised its option to purchase the property in 1996. In 1997, Landlord exercised its remedies under the lease and required Plaintiff to submit an offer to purchase the property. In both instances, under the terms of the lease, Plaintiff agreed to purchase the property and Landlord agreed to sell the property. Therefore, the fact of Plaintiff's liability may have been fixed, even if the amount had yet to be determined. *See* 49 Am. Jur. 2d *Landlord and Tenant* § 318 (explaining when a tenant exercises an option to purchase the premises, a bilateral contract is created.). *See also Riddle,* 52 S.W.2d at 646-647 (holding, when a buyer exercises an option to purchase, it creates a binding bilateral contract); *Henze*, 758 S.W.2d at 96 (holding, when a tenant exercises an option to purchase contained in a lease, a bilateral contract is formed for the sale of the premises (citing *Gulf Oil Corp. v. Ferguson*, 509 S.W.2d 1 (Mo. 1974) and *Wilson v. Edwards*, 560 S.W.2d 608, 612 (Mo. Ct. App. 1978)).

Defendant has not conclusively established that either party could withdraw from the agreement to transfer the property from Landlord to Plaintiff. The letter referenced by Defendant in which Landlord

states Plaintiff is in default may support the inference that Landlord did not consider Plaintiff's exercise of the option to purchase as an enforceable contract.  However, for the purposes of Defendant's motion, all inferences must be viewed in a light most favorable to Plaintiff.  Because Landlord exercised its remedies to require Plaintiff to submit an offer, the letter also supports the inference that Landlord sought to enforce what it considered a binding agreement.

The parties also dispute when the amount of liability was established, or could be established with reasonable accuracy.  Defendant argues the lease contained only a formula for determining the sale price, but not a fixed amount.  Defendant argues Landlord and Plaintiff did not establish a minimum amount for the purchase until January 1999.[14]  (Dkt. No. 46-12 - January 1999 Letter).  Defendant argues Landlord and Plaintiff did not reach a final agreement on the purchase price until October 1999.  (Dkt. No. 46-14 - Agreement Letter).  Finally, Defendant points out the title to the property was not conveyed until November 1999.  (Dkt. No. 46-15 - Closing Statement).  Plaintiff argues the minimum amount it would have to pay for the property was established in 1997, based on its own calculations and calculations by Landlord.  Plaintiff asserts it calculated the minimum it would have to pay for the property at $9 million. (Dkt. No. 54-2, Exhibit 1 to Plaintiff's brief in response - Nelson's declaration ¶ 12; Dkt. No. 54-7, Exhibit 6 to Plaintiff's brief in response - McReynolds' Deposition at 136).  Plaintiff points out, on April 24, 1997, Defendant determined the purchase price to be over $14 million.  (Dkt. No. 46-8 - April 1997 letter). Plaintiff concludes the two calculations establish it would have to pay a minimum of $9 million for the property.  Plaintiff also argues only two variables in the formula provided in the lease were ever in dispute,

---

[14]Defendant argues, even if Plaintiff made its own calculations in 1997, it presents no evidence that the parties agreed the minimum amount for the purchase would be $9 million. Plaintiff's evidence reflects it informed Defendant of Plaintiff's internal calculations.  (Dkt. No. 48-8, Exhibit 7 to Plaintiff's brief in support - March 1997 Letter).  In this letter, Plaintiff outlines where there may be disputes over the variables to be entered into the purchase price formula and attaches calculations for a number of combinations of those variables.

the inflation rate and the applicable discount rate.

Viewing the evidence in a light most favorable to Plaintiff, there is a genuine issue of material fact when the amount of liability was established with reasonable accuracy. The lease provided a formula which would determine the final sale price. The disagreement between the parties centered on the amount of several of the variables that would be entered into the formula. Plaintiff determined in 1997, the minimum amount it would owe Landlord was $9 million, although it could owe more. Those facts, when viewed in a light most favorable to Plaintiff, are sufficient to create a genuine issue of material fact concerning the date when the amount of liability was established with reasonable accuracy.

The parties also dispute when economic performance occurred. Defendant argues economic performance did not occur until 1999, when the title to the property was passed from Landlord to Plaintiff. Defendant asserts, because Plaintiff was already in possession of the premises and had been using the premises for years, performance could only occur upon transfer of title. Plaintiff responds economic performance occurred in 1997 because its use of the property ceased under the lease when the lease terminated upon acquisition. Plaintiff argues the taxpayer gets to determine when the property was provided to it, either through delivery, acceptance, or by the transfer of title.

Under 26 U.S.C. § 461(h)(1), the all events test is not met any early than when economic performance occurs. Economic performance occurs when the taxpayer's liability arises out of (1) the *providing* of property to the taxpayer by another person (26 U.S.C. § 461(h)(2)(A)(ii) (emphasis added)) or (2) the *use* of the property by the taxpayer (26 U.S.C. § 461(h)(2)(A)(iii) (emphasis added)). Here, Plaintiff's liability does not arise due to its use of the property. *See* Treas. Reg. § 1.461-4(d)(3)(i) ("if liability of a taxpayer arises out of the use of property by a taxpayer, economic performance occurs ratably over the period of time the taxpayer is entitled to use the property (taking into account any reasonably expected renewal periods when necessary . . . )." As explained under this provision, economic

performance occurs when a taxpayer is entitled to use the property under a lease or some other temporary arrangement.  Plaintiff here purchased the property and therefore liability does not arise from its use of the property over time.

The question then is when the property was provided to Plaintiff?  Under Treas. Reg. § 1.461-4(d)(6)(iii) a taxpayer may treat property as provided when the property is delivered, or accepted, or when title to the property passes.  Title to the property passed in 1999.  The facts do not clearly establish when the property was delivered or accepted.  If it is possible for estates to be delivered and accepted, Landlord delivered the leasehold to Plaintiff when the lease was signed in 1987 and Plaintiff accepted the property when it took possession of it.  If it is possible for estates to be delivered and accepted, the facts do not clearly establish when the fee simple estate was delivered and accepted.  Plaintiff possessed a leasehold and had possession of the property since 1987.  Plaintiff never relinquished possession of the property.

Plaintiff argues it assumed ownership of the property in 1997 because it paid the property taxes, maintained the property and bought the insurance on the property.  Plaintiff alleges it took depreciation deductions on the property as well.  Plaintiff argues, for federal tax purposes, ownership of property occurs upon the transfer of the benefits and burdens of ownership, citing *Walter v. IRS*, 753 F.2d 35, 38 (6th Cir. 1985) and an IRS Internal Revenue Bulletin, Rev. Rul. 2005-74.[15]  In its reply, Defendant points out that Plaintiff had all of these obligations under the lease and therefore the facts do not clearly demonstrate that Plaintiff performed these obligations as the property owner rather than the lessor.  The lease also contains a provision outlining Plaintiff's obligations to continue to pay rent in the event that there was some delay

---

[15]One portion of the IRS document omitted from the portion quoted by Plaintiff states "[w]hether the benefits and burdens of ownership have been transferred is a question of fact that must be ascertained from the intention of the parties as evidenced by their written agreements read in light of attending facts and circumstances."  Rev. Rul. 2005-74 (available at http://www.irs.gov/irb/2005-51_IRB/ar07.html).  To the extent a question of fact exists concerning when ownership transferred, this Court would view the evidence in a light most favorable to Plaintiff.

23

in completing the purchase of the property.  (Dkt. No. 46-6 - Lease § 16(b)).  Accordingly, there are genuine issues of material fact as to when ownership transferred and when the property was provided (delivered or accepted) to Plaintiff.[16]

Defendant's motion for summary judgment is therefore DENIED.  Defendant is not entitled to summary judgment under 26 U.S.C. § 162(c)(2).  This Court disagrees with the Tax Court's interpretation of section 162 in *Union Carbide*.  Furthermore, this Court concludes *Millinery Center* did not overrule *Cleveland Allerton*.  There are genuine issues of material fact as to when the fact and amount of liability were established under the all events test, and when economic performance occurred.

B.  Plaintiff's Motion for Summary Judgment (Dkt. No. 47)

Plaintiff advances two central arguments in support of its motion for summary judgment.  First, Plaintiff asserts the holding in *Cleveland Allerton* is binding on this Court and that *Millinery Center* left

_____

[16]In Defendant's reply brief (Dkt. No. 59) in support of its motion, Defendant directs this Court's attention to another provision of regulation 1.461.  If liability cannot be characterized so as to fall under one of the other provisions of the rules, economic performance occurs as the taxpayer makes payments in satisfaction of what is owed.  Treas. Reg. § 1.461-4(g)(7).  Defendant argues Plaintiff is in a catch-22.  Plaintiff initially wants to characterize the transaction as  a business expense for buying out a burdensome lease, rather than as the acquisition of a capital asset.  Plaintiff then seeks to characterize the transaction as a provision of property for the purposes of identifying when that deduction can be taken.  If the amount paid can be properly characterized as a purchase of property, then Plaintiff is not entitled to a business deduction.  If, on the other hand, the amount paid was to buy out a burdensome lease, then time of economic performance would not be determined under the regulation for the provision of property, but under the catch-all provision, Treas. Reg. § 1.461-4(g)(7).  In order to be able to take the deduction as a business expense, the transaction cannot be characterized as a transfer of ownership of property.

Although this argument has appeal, Plaintiff has not been afforded an opportunity to respond to it.  Issues raised for the first time in a reply brief are not properly before a court because the other side has no opportunity to respond.  *N.L.R.B. v. Int'l Health Care, Inc.*, 898 F.2d 501, 506 n. 5 (6th Cir. 1990); *Sundberg v. Keller Ladder*, 189 F. Supp.2d 671, 682-683 (E.D. Mich. 2002).

*Cleveland Allerton's* basic proposition intact.[17]  Second, Plaintiff insists the Tax Court's holdings in *Union Carbide* misinterprets section 167(c)(2) as well as the holdings in *Millinery Center*.  As further support for its position, Plaintiff argues *Union Carbide's* holdings are inconsistent with earlier interpretations of *Millinery Center* and *Cleveland Allerton* by the IRS.[18]  (Dkt. No. 48-22, Exhibit 21 to Plaintiff's brief in support - Private Ruling Letter 9842006 (1998) and Dkt. No. 48-23, Exhibit 22 to Plaintiff's brief in support - Field Service Advice 199918022 (1999)).

In response, Defendant argues section 167(c)(2) should govern the outcome of the dispute and asserts that section 167(c)(2) precludes Plaintiff from allocating any portion of the purchase price to its leasehold.  Defendant further insists there are other provisions of the tax code which would prohibit Plaintiff from claiming this deduction.[19]  Defendant also argues *Millinery Center* effectively overruled *Cleveland Allerton*.  As an alternative, Defendant contends there are genuine issues of material fact, such as whether the lease was excessive and whether Plaintiff has established the correct fair market value of the property.  Defendant contends Plaintiff suffers the same problem that the petitioner in *Millinery Center* suffered.  Defendant argues Plaintiff has only established the fee simple value of the property, but not the value of the property with the lease.

Initially, this Court has already resolved much of the legal authority at issue in Plaintiff's favor.

---

[17]Plaintiff cites *Troc, Inc. v. United States*, 126 F.Supp. 786 (N.D. Ohio 1954) as additional authority that *Cleveland Allerton* is binding authority.  *Troc* was decided prior to *Millinery Center*.

[18]Defendant correctly points out that private ruling letters (PLRs) and field service advice (FSA) are considered written determinations under 26 U.S.C. § 6110(b)(1)(a) and have no precedential value under 26 U.S.C. § 6110(k)(3).  Neither of the written determinations, which are necessarily driven by the factual situation presented, involved the purchase of real estate subject to a leasehold.

[19]These provisions of the tax code were outlined in a footnote in Defendant's motion for summary judgment.  This Court has already concluded the provisions are not controlling.  *See footnote 6.*

*Millinery Center* did not overrule *Cleveland Allerton*.[20]  Plaintiff may claim a deduction for the cost attributable to buying out an onerous lease.[21]  Plaintiff has the burden of establishing the amount of the purchase price attributable to the onerous lease.  Section 167(c)(2) does not control the outcome of the dispute.  The statute is not ambiguous and its plain ordinary meaning covers situations where a taxpayer acquires property subject to a lease.  If, upon acquisition, the property is subject to a lease, the statute applies.  If, upon acquisition, the property is not subject to a lease, the statute does not apply.  Here, the leasehold extinguished upon acquisition, and the property was not acquired subject to a lease.  This Court also concluded there are genuine issues of material fact precluding summary judgment on when the deduction may be taken.

Turning to Defendant's response, Defendant asserts there is a genuine issue of material fact whether the lease is excessive.  Defendant alleges Plaintiff obtained the property in 1987 through a sale and leaseback arrangement.  Through such an arrangement, a party can secure a greater amount of financing which would explain why the rents under the lease were higher than market rates.  (Dkt. No. 53-3, Exhibit 2 to Defendant's brief in response - McReynold's Deposition at 99-101).  Sale and leaseback arrangements were usually structured to have the note paid off before a renewal period could begin and

---

[20]Defendant argues in its response brief, the words "subject to a lease" are words of qualification rather than words of contract, which describe the condition of the estate, citing *S.T. McKnight Co. v. Central Hanover Bank & Trust Co.*, 120 F2d 310, 320 (8th Cir. 1941). *McKnight,* and the authority cited therein, do not definitively resolve the issue.  Court opinions reaching the conclusion that the phrase "subject to a lease" merely describes what was acquired do not assist this Court in resolving whether the property here, when acquired, was subject to a lease.  If the lease expired upon acquisition, the property could not be described as being "subject to a lease," if that phrase was merely one of qualification or description.

[21]Plaintiff argues the proposition that a taxpayer may deduct the cost of cancelling a burdensome contract is well established, citing a bevy of cases.  (Dkt. No. 48 - Plaintiff's brief in support fn. 4).  Generally, those cases do not involve the situation here where a taxpayer has acquired a capital asset for a cost which exceeds the appraised value of that capital asset.  In addition, none of the cases cited by Plaintiff take into account the changes to the tax code at issue here.

would accelerate rents for any renewal period in order to provide an incentive for the lessee to leave or buy the property rather than exercise the option to renew the lease.  (Dkt. No. 53-4, Exhibit 3 to Defendant's brief in response - Marchitelli Deposition at 79-83).  Defendant argues, because the sale and leaseback of the property in 1986 allowed Plaintiff to secure financing that would otherwise have been unavailable, there are genuine issues of material fact which preclude concluding the lease was excessive.

Viewing the facts in a light most favorable to Defendant, Defendant has not established a genuine issue as to whether the terms of the lease were excessive.  The focus here is the property value and rent clause in 1997.  Defendant's focus on the original sale and leaseback arrangement ten years earlier ignores Mr. Marchitelli's concession that the special financing arrangements typically are paid off by the end of the original lease term.  According to Mr. Marchitelli, the beneficial aspects of the financing typically end for both parties at the end of the original lease term, and the rent escalation clause provides an incentive for the lessee to either end the lease or purchase the property.   Defendant has not offered any evidence to contradict Plaintiff's estimation of the fair market value of the lease.[22]  Defendant's expert concedes, under the escalated rent calculations, Plaintiff would have to pay more than one million dollars a year to rent the property during the first renewal period.  (Dkt. No. 53-4 Marchitelli Deposition at 85).  Defendant's expert also states he offers no opinion as to what the fair market value rent of the facility was in 1997.  (*Id.* at 87).

The remaining issue is whether there is a genuine issue of material fact as to fair market value of the property.  Defendant argues Plaintiff neglects to include the fair market value of the lease as part of the fair market value of the property.  In *Millinery Center*, the Supreme Court stated that the purchase price "presumably" reflected the entirety of what the taxpayer was purchasing, which included the "lessor's

---

[22]Mr. McReynolds estimated the fair market value of the lease was $356,500 per year. (Dkt. No. 48-5 - McReynolds' Appraisal).

interest in the land and building" as well as "the elimination of the obligation to pay rent on the improved land." 350 U.S. at 460. The criteria used to determine the value of property is a question of law while the determination of the fair market value of property is a question of fact. *Morris v. IRS*, 761 F.2d 1195, 1200 (6th Cir. 1985). "Fair market value" is determined by what a willing buyer would pay to a willing seller. *United States v. 103.38 Acres of Land*, 660 F.2d 208, 211 (6th Cir. 1981) (citing *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 473-474 (1973)). Here, Plaintiff has offered evidence establishing that the lease was excessive. Plaintiff has offered evidence establishing the amount it paid to acquire the property in an effort to buy out the lease. Plaintiff has offered several appraisals of the property, each using multiple appraisal methods, in an effort to establish the fair market value of the property. Other than the bare assertion that the appraisals fail to consider the value of the lease, Defendant has not offered any evidence to contradict the three appraisals of the property performed around 1997.[23] Defendant has not offered any evidence as to what the fair market value of the property would be if it included the fair market value of the lease. Defendant has not offered any evidence indicating what the fair market value of the lease would be. Taking Plaintiff's evidence and viewing it in a light most favorable to Defendant, Defendant has not created a genuine issue of material fact.

Plaintiff's motion for summary judgment is GRANTED. Under Sixth Circuit precedent, Plaintiff is entitled to deduct that portion of the purchase price attributable to buying out an excessive lease. Section 167(c)(2) does not govern the outcome here.

IV. CONCLUSION

Under Sixth Circuit precedent, Plaintiff is entitled to claim a deduction for the portion of the

---

[23] Defendant's expert criticizes the three appraisals as failing to consider the number and sizes of the overhead doors. (Dkt No 53-4 Marchitelli Deposition at 59-60). Mr. Marchitelli does not offer an appraisal amount for the property and further concedes he does not know how much the doors would affect the value of the property. (*Id.* at 62-63).

28

purchase price which can be attributed to buying out the excessive lease.  Plaintiff has established the fair market value of the property, that the lease was excessive, and that the amount it paid to acquire the property over the fair market value of the property is attributable to buying out the onerous lease.  There is, however, a genuine issue of material fact precluding summary judgment on when the deduction may be taken.

ORDER

Consistent with the above opinion, Plaintiff's motion (Dkt. No. 47) is **GRANTED.**  For the same reasons, Defendant's motion (Dkt. No. 46) is **DENIED.  IT IS SO ORDERED.**

Date:   August 27, 2008                                    /s/ Paul L. Maloney
                                                           Paul L. Maloney
                                                           United States District Judge